IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF ARKANSAS
LITTLE ROCK DIVISION

IN RE: BRYAN AND KAREN DEARASAUGH, Debtors     No. 4:17-bk-10969
Chapter 11

OPINION AND ORDER DENYING FIRST SECURITY BANK'S
MOTION WITHOUT PREJUDICE

On March 8, 2017, First Security Bank [FSB] filed a motion to prohibit the debtors' use of cash collateral [motion]. On March 29, 2017, the debtors filed a response to FSB's motion. The Court held a hearing on the motion and response on May 18, 2017. Gary D. Jiles appeared on behalf of FSB. Kevin P. Keech appeared on behalf of the debtors. At the conclusion of the hearing, the Court took the matter under advisement. For the reasons stated below, the Court denies FSB's motion to prohibit the debtors' use of cash collateral without prejudice to FSB filing an objection to a subsequent motion by the debtors to use cash collateral, in the event that one is filed.

**Background**

For the past 12 years, the debtors have earned a living by purchasing several properties to lease or rent, collecting the rents, and managing the properties. To fund the purchases of rental properties over the years, the debtors obtained loans from various lending institutions. Relevant to motion before the Court are eight loans that the debtors obtained from FSB:[1]

| loan no. | monthly payment | day of month due | balloon payment due on maturity date | maturity date |
|---|---|---|---|---|
| 0711 | $638.46 | 27th | $22,000.31 | 11/27/18 |
| 6618 | $1456.00 | 10th | $128,833.11 | 08/10/18 |
| 3682 | $1034.27 | 4th | $92,476.36 | 03/04/19 |

---

[1] The payments and maturity dates are stated according to the terms of the most recent renewal for each loan, if applicable.

| | | | | |
|---|---|---|---|---|
| 4075 | $514.79 | 23rd | $37,465.10 | 04/23/19 |
| 8288 | $675.86 | 12th | $29,981.04 | 06/12/17 |
| 8124 | $1094.37 | 16th | $120,595.04 | 01/16/19 |
| 0118 | $541.15 | 15th | $48,387.69 | 04/15/19 |
| 2352 | $347.01 | 10th | $27,943.21 | 08/10/18 |

Each of the debtors' loans with FSB is secured by one or more rental properties. Each mortgage executed by the debtors provides for (1) the debtors' assignment of rents to FSB and (2) FSB's grant to the debtors of a license to collect and use the rents unless the debtors default, in which case the license is automatically revoked. A default on any loan agreement between the debtors and FSB constitutes a default on all other loan agreements between the parties–irrespective of whether the other loans are current at the time.

FSB contends that before the debtors filed their chapter 11 bankruptcy petition on February 20, 2017, they defaulted on their eight loans with FSB by failing to make monthly payments on the dates required by the loan documents. FSB acknowledges that it did not give the debtors written notice of the alleged defaults, but maintains that it was not required to do so. Rather, FSB contends that when the debtors failed to make payments on the days the payments were due, they were in default, resulting in the debtors' licenses to collect and utilize the rents being automatically revoked and immediately entitling FSB to the rents from that point forward.

The debtors deny that FSB is entitled to the rents in question. At the May 18 hearing, Karen Dearasaugh testified that the debtors remained current on all loans with FSB through January 31, 2017, and stopped making payments to FSB beginning on February 1, 2017, before filing their bankruptcy petition later that month on February 20.[2]

---

[2] FSB did not specify which late loan payment allegedly triggered the debtors' default on all eight loans. However, based upon Karen Dearasaugh's uncontradicted testimony that the debtors remained current on all eight loans through January 31, 2017, and the terms of the loan documents introduced at trial, it appears that the debtors first late payment occurred on February 4, 2017, in relation to loan 3682.

However, the debtors contend that their failure to timely remit the February payments to FSB, without more, does not equate to a default under the loan documents. Instead, the debtors argue that no default occurred because FSB failed to notify them in writing of their alleged default as required under the loan documents. The debtors assert that, absent a pre-petition default, FSB could not have revoked the debtors' licenses to collect the rents in question and no pre-petition assignment of rents in favor of FSB took place.

**Findings of Fact and Conclusions of Law**

Since filing their chapter 11 petition on February 20, 2017, the debtors have operated as debtors in possession. Pursuant to 11 U.S.C. § 1107, debtors in possession have the rights, powers, and duties of a trustee. Unless the court orders otherwise, a trustee may operate the debtor's business under § 1108 and use property of the estate in the ordinary course of the debtor's business pursuant to § 362(c)(1). However, a trustee may not use cash collateral unless each entity that has an interest in such cash collateral consents or the court, after notice and a hearing, authorizes such use. 11 U.S.C. § 363(c)(2). Cash collateral is defined as

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . whether existing before or after the commencement of a case under this title.

11 U.S.C. § 363(a). Here, the "cash collateral" at issue consists of the rents collected by the debtors from tenants of the properties securing the debtors' eight loans with FSB. If the rents are truly cash collateral–meaning that both the estate and FSB have an interest in the rents–then the debtors may collect the rents but they are precluded from using the rents unless they either obtain FSB's consent pursuant to § 363(c)(2)(A) or they file a motion to use cash collateral and, after notice and a hearing, the Court enters an order authorizing such use under § 363(c)(2)(B). Had the debtors filed a motion to use cash collateral under § 363(c)(2)(B), the Court could have combined a hearing on the debtors' motion with the May 18 hearing on FSB's motion to prohibit the use of cash collateral. *See* 11 U.S.C. § 363(c)(3). However, while the debtors stated in their March 29 response

to FSB's motion that they anticipated filing a motion to use cash collateral, to date, they have not done so.  As a result, the only motion currently before the Court is FSB's motion to prohibit the use of cash collateral, which, based on the title, appears to be a motion under § 363(e).  Section 363(e) provides:

> Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).  An examination of the content of FSB's motion, however, leads the Court to conclude that FSB does not merely seek to prohibit the debtors' use of cash collateral as the title of its motion indicates.  Rather, FSB seeks a determination that the rents in question are *not* cash collateral based upon an alleged pre-petition absolute assignment of rents to FSB.  As previously stated, FSB argues that the debtors defaulted on all eight loans upon the debtors' first late payment.  Based upon the debtors' alleged pre-petition absolute assignment of rents, FSB contends that the default triggered an automatic revocation of the debtors' license to collect and use the rents and immediately entitled FSB to those rents.  Therefore, the Court will review the relevant portions of the loan documents to determine whether the debtors did, in fact, default on their obligations with FSB prior to filing bankruptcy.  If the Court agrees with FSB's contention that a pre-petition default occurred, then the Court will next address FSB's assertions regarding the effects of the default.

The Court finds that the mortgages associated with the loans purport to assign the rents to FSB while simultaneously granting the debtors licenses to collect the rents.  Specifically, the mortgages associated with loan 7011 state, in relevant part:

> Mortgagor may collect, receive, enjoy and use the Rents so long as Mortgagor is not in default.  Mortgagor will not collect in advance any Rents due in future lease periods, unless Mortgagor first obtains Lender's written consent.  *Upon default*, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds.

4

(Pl. Exs. 4, 5.) (emphasis added)  The mortgages associated with loans 6618, 3682, 4075, 8288, 8124, 0118, and 2352 state, in relevant part:

> Lender grants to Mortgagor a revocable license to operate and manage The Property and collect the Rents, but not more than one month in advance. *Upon an Event of Default*, the license granted to Mortgagor herein shall automatically be revoked and Lender shall immediately be entitled to receive and apply all Rents, whether or not Lender enters upon and takes control of the Property.

(Pl. Exs. 7, 9, 11, 13, 15, 17, 19.) (emphasis added)  Although the language of the license granted in relation to loan 7011 differs from the others, the Court finds that all of the licenses authorize the debtors to collect rents on the mortgaged properties without imposing a requirement that the debtors use the rents for a specific purpose, such as making payments on their loans with FSB.  Additionally, the Court agrees with FSB's assertion that, upon the debtors' default, the licenses are revoked automatically under the terms of the loan documents.  However, for the reasons stated below, the Court disagrees with FSB's contention that a late monthly payment results in a similarly automatic default.

The loan documents provide that the agreements between the debtors and FSB are governed by Arkansas and federal law.  Under Arkansas law, "[d]ifferent clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible, and giving effect to one clause to the exclusion of another on the same subject where the two are reconcilable, is error." *Continental Cas. Co. v. Davidson*, 463 S.W.2d 652, 655 (Ark. 1971).  Therefore, to determine whether the debtors' late monthly payments were sufficient to trigger an automatic default on the debtors' eight loans with FSB, the Court must consider the loan documents in their entirety, construe different clauses on the same subject in harmony, and if at all possible, give effect to all clauses.  The Court will discuss the relevant clauses below.

The loan documents address late payments as follows:

> **LATE PAYMENT CHARGE.**  If any required payment is more than

> 10 days late, then at Lender's option, Lender will assess a late payment charge of 10.000% of the amount of the regularly scheduled payment then past due, subject to a maximum charge of $250.00 and a minimum charge of $20.00.

(Pl. Exs. 2, 6, 8, 10, 12, 14, 16, 18.) Because the Late Payment Charge section references a "regularly scheduled payment" the Court finds that this section applies to late monthly payments (rather than final balloon payments that would be paid only once on the maturity date of each loan).[3] Additionally, the Court finds that this section gives FSB the right to penalize the debtors for a late monthly payment by assessing an optional late charge–but not during the first 10 days after a missed payment. Rather, the section provides that only when a monthly payment is "more than 10 days late" may FSB "assess a late payment charge of 10.000% of the amount of the regularly scheduled payment then past due, subject to a maximum charge of $250.00 . . . ." Because FSB was not authorized to assess a late payment charge at all until a monthly payment was more than 10 days late–and, even then, could not penalize the debtors by assessing a fee greater than $250.00–the Court finds this section to be inconsistent with FSB's contention that a late monthly payment is tantamount to an immediate automatic default.

In fact, the loan documents specifically define the events that constitute a default:

> **EVENTS OF DEFAULT**. The occurrence of any one or more of the following shall constitute an Event of Default under this Promissory Note:
> (a) Default in payment when due of any interest or principal on this Note or any other Indebtedness due Lender from Borrower or any affiliate of Borrower (whether at stated maturity, upon acceleration, or otherwise);
> (b) If any other amount payable by the Borrower to the Lender under the Loan Agreement or any Related Document shall not be paid when due and such default shall continue for a period of fifteen (15) days from the date that the Lender gives written notice of such failure to the Borrower; or
> (c) any other failure of Borrower to comply with any term, obligation, covenant or condition contained in this Note, or any of the Related

---

[3] The Court recognizes that the final balloon payment could be due before the stated maturity date if the loan was accelerated subsequent to an Event of Default, as discussed later in this order.

> Documents and the failure of the Borrower to remedy such failure within the time provided in this Note or Related Documents.[4]

(Pl. Exs. 2, 6, 8, 10, 12, 14, 16, 18.) When subsection (a) is read in isolation, the language is so broad that it appears to provide that a late payment of any kind–including a late monthly payment–triggers an automatic default on all loans without requiring FSB to notify the debtors in writing or otherwise. However, the Court must give effect to all clauses and such a broad reading of subsection (a) would render subsection (b), discussed below, superfluous. Additionally, when the Court interprets subsection (a)–as it must–within the context of the loan documents as a whole and the Late Payment Charge section in particular (which, as discussed above, delineates specifically both the nature and timing of the penalty for a late monthly payment), the Court finds that subsection (a) does not relate to monthly payments. Rather, the Court finds that subsection (a) applies to final balloon payments or accelerated notes due in full–a finding that is bolstered by the fact that subsection (a) refers parenthetically to "stated maturity" and "upon acceleration"–terms unrelated to regular monthly payments and instead associated with final balloon payments or entire notes that have been accelerated. Because none of the debtors' eight loans had maturity dates earlier than February 20, 2017, and there is no evidence that FSB had accelerated the loans prior February 20, the Court finds that the debtors did not default under subsection (a).

As the Court found above, subsection (a) deals with final balloon payments and notes due in their entirety after acceleration. In contrast, the Court finds that subsection (b), which covers "any other amount payable" to FSB, encompasses late monthly payments. The Court finds that subsection (b) does not conflict with the Late Payment Charge section, but instead outlines the steps that FSB must take for late monthly payments that could be penalized under the Late Payment Charge section to rise to an Event of Default. Subsection (b) provides for a default if an amount payable to FSB (i.e., a monthly

---

[4] Although the original note associated with loan 7011 contained a different definition of default, the most recent renewal note for loan 7011 dated November 27, 2015, used the same definition as the notes associated with the other seven loans.

payment) "shall not be paid when due and such default shall continue for a period of fifteen (15) days from the date that the Lender gives written notice of such failure to the Borrower." Therefore, the debtors' late monthly payments could have provided a basis for an Event of Default, but only if FSB had first notified the debtors in writing of the late payments and the debtors had then failed to make the required payments within 15 days of the written notice. Because FSB acknowledges that it did not notify the debtors in writing of the late payments, the Court finds that the debtors did not default under subsection (b).

The Court further finds that FSB did not prove that the debtors breached any "term, obligation, covenant or condition" of their loan agreements with FSB that would fall under Events of Default subsection (c). Although FSB stated in its motion that the debtors were in default on all eight notes "due to, *among other things*, there [sic] failure to make the required payments of principal and interest when due" and, at trial, introduced a bank statement and elicited testimony suggesting that the debtors commingled rents with other funds and paid personal expenses from those funds, the Court finds that the only prohibition contained in the loan documents against commingling funds appears in the mortgages associated with loan 7011 and states that *"Upon default*, Mortgagor will receive any Rents in trust for Lender and Mortgagor will not commingle the Rents with any other funds." (Pl. Exs. 4, 5.) (emphasis added) Therefore, absent a prior default, the Court finds that the debtors had no obligation to keep the rents separate from other funds. Because FSB did not allege any other basis for a default under this subsection, the Court finds that the debtors did not default under subsection (c). For the above-stated reasons, the Court finds that the debtors did not default on their eight loans with FSB prior to filing their chapter 11 petition on February 20, 2017.[5]

---

[5] Because FSB's only claim to its entitlement to the rents was predicated upon the debtors' alleged pre-petition default and the Court finds no such default, the Court need not decide whether the assignments in this case would have been absolute assignments under state law had there been a pre-petition default. *Compare In re*

Finally, the Court finds that both the debtors and FSB have an interest in the rents pursuant to the loan agreements. As a result, the Court finds that the rents are cash collateral under § 363(a). Because the debtors have obtained neither FSB's consent nor an order from the Court authorizing their use of cash collateral, the Court extends its order dated May 25, 2017, and prohibits the debtors from using the rents unless and until they meet one of the conditions required for the use of cash collateral under § 362.

IT IS SO ORDERED.

/s/ Ben Barry

Ben Barry
United States Bankruptcy Judge
Dated: 06/26/2017

cc: Gary D. Jiles, attorney for First Security Bank
Kevin P. Keech, attorney for the debtors
Bryan and Karen Dearasaugh, debtors
United States Trustee

---

*Amaravathi Ltd. P'ship*, 416 B.R. 618 (Bankr. S.D. Tex. 2009) (holding that § 541(a)(6) preempts assignments of rents under state law), *with In re Madison Heights Group, LLC*, 506 B.R. 734 (Bankr. E.D. Mich. 2014) (holding that ownership of rents is determined under state law rather than § 541(a)(6)).

9